USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-2271 UNITED STATES, Appellee, v. PHILIP M. CALI, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Aldrich and Bownes, Senior Circuit Judges. _____________________ ____________________ John P. Ward with whom David Duncan and Zalkind, Rodriguez, Lunt ____________ _____________ _________________________ & Duncan were on brief for appellant. ________ Brian T. Kelly, Assistant United States Attorney, with whom ________________ Donald K. Stern, United States Attorney, were on brief for appellee. _______________ ____________________ June 25, 1996 ____________________ BOWNES, Senior Circuit Judge. On June 1, 1995, BOWNES, Senior Circuit Judge. _____________________ defendant-appellant Philip Cali ("Cali") pled guilty to count sixty-nine of a seventy-one count indictment charging him with operating an illegal gambling business in violation of 18 U.S.C. 1955, 2. Cali now appeals the fifteen-month sentence of imprisonment he received, contending that the district court enhanced the prison term mandated by the Sentencing Guidelines ("Guidelines") because of the erroneous view that U.S.S.G. 3B1.1 permits a base offense level adjustment for mere management of assets or property. Cali also maintains that the district court's alternative holding that upward departure was appropriate because his conduct fell outside section 3B1.1's heartland was clearly erroneous. We agree that mere management of assets is insufficient for a base offense level adjustment under section 3B1.1, but find that the district court's alternative determination cures any defect in its holding. Accordingly, we affirm. Jurisdiction stems from 18 U.S.C. 3742. I. I. THE FACTS THE FACTS _________ We consider the facts as set forth in the unobjected-to portions of the Presentence Investigation Report ("PSI") and the transcript of the sentencing hearing. See, e.g., United States v. Peppe, 80 F.3d 19, 20 (1st Cir. ___ ____ _______________________ 1996); United States v. Grandmaison, 77 F.3d 555, 557 (1st _____________________________ -2- 2 Cir. 1996). On October 15, 1993, Philip Cali was arrested pursuant to count sixty-nine of a seventy-one count indictment charging him with conducting, financing, managing, supervising, directing, and owning all or part of an illegal gambling business which involved five or more persons between October 1986 and December 1992. The result of an eight year Massachusetts State Police ("State Police") investigation into large-scale racketeering conspiracies, the indictment named nine individuals, four of whom -- Joseph Yerardi ("Yerardi"), William Maguire ("Maguire"), Anthony Grabiec Jr. ("Grabiec"), and Salvatore M. DeAngelis ("DeAngelis") -- were charged in count sixty-nine with Cali. Cali, who is sixty- five and has a criminal history which includes convictions for gambling-related activities, was not charged in any of the indictment's other counts. During the course of their racketeering investigation, the State Police obtained authorization to intercept phone conversations over a cellular telephone utilized by Yerardi from June to August 1991. Their surveillance of the telephone revealed that Yerardi presided over extensive loansharking and gambling businesses. The gambling business, which operated under the auspices of Boston's Winter Hill Gang and generated funds for Yerardi's loansharking business, included over twenty-five bookmaking agents, two principal offices, and had a gross daily revenue -3- 3 of $2,000.00. Though Yerardi headed the gambling enterprise, Maguire was its principal supervisor and the individual responsible for collecting money owed to the organization and paying out money owed to agents and bettors. Transcripts of numerous calls between Yerardi and Cali intercepted by the State Police revealed that Cali and DeAngelis played the same role in the gambling enterprise, though they operated out of different locations. Yerardi stationed Cali, who frequently placed bets with the business and was often one of its debtors, at one of the business's principal bookmaking offices to receive calls from the various agents. The agents, who identified themselves by code only and received a percentage of the business's profits as compensation, communicated information about sporting event bets to Cali. After taking and recording that information, Cali transmitted it directly to Yerardi, with whom he was in daily telephone contact. The majority of the calls intercepted by the State Police were made by Yerardi to Cali at the bookmaking office. Cali often reviewed betting results with and reported agents' makeup figures -- those monies that have to be worked off before any money can be paid out -- to Yerardi during these telephone conversations. He also assisted in charting bets for the gambling business. Charting involves tracking daily bets made by agents and monitoring the -4- 4 business's projected risk of loss on individual sporting events. Though Cali answered directly to Yerardi and was responsible for completing charting analyses, there is no evidence that he received a percentage of the business's profit or played any role in setting policy regarding odds or bet placement. On June 1, 1995, Cali pled guilty to participating in the operation of an illegal gambling business. The district court scheduled a sentencing hearing and prior thereto received a PSI from the Probation Department. The PSI prepared by the Probation Department, to which both the government and Cali registered objections, recommended a total adjusted guideline offense level of ten. This recommendation reflects a two level decrease in the base offense for acceptance of responsibility. See U.S.S.G.  ___ 2E3.1(a); 3E1.1. The PSI concluded, based on the information provided by the government and the defendant's description of his duties that an adjustment for role in the offense would not be warranted.  The Probation Department assigned Cali three criminal history points for prior gambling convictions and, as a result, placed him in Criminal History Category II. The district court, however, later found that the Probation Department had erroneously assigned Cali criminal history points for offenses committed while working for Yerardi and -5- 5 identified the appropriate criminal history category as I. Placement in Criminal History Category I, at a total adjusted offense level of ten, results in a sentencing range of six to twelve months. II. II. THE SENTENCING HEARING THE SENTENCING HEARING ______________________ At the sentencing hearing, Cali requested a downward departure on the grounds that both he and his wife suffered, inter alia, from serious heart conditions and _____ ____ largely supported themselves on Social Security income benefits that would be unavailable to them for any period that Cali was incarcerated. The government disputed the contention that Cali was entitled to departure on this basis and objected to the two-point adjustment for acceptance of responsibility recommended by the Probation Department. Additionally, the government objected to the PSI's failure to add four levels under section 3B1.1(a) for supervisory role, arguing that an enhancement was warranted because Cali managed people and assets within that guideline's meaning. The government also argued that the Criminal History Category I assignment Cali received did not adequately reflect the seriousness of his past criminal history.  The district court denied the objections and requests made by both Cali and the government. It refused Cali's request for a health-related departure, concluding that the factors cited by the defense did not, "separately or -6- 6 together, justify departure." It also rejected the government's objection to the two-point adjustment for acceptance of responsibility recommended by the PSI. Finally, the court found that the severity of Cali's criminal history was not underrepresented by the amended criminal history calculation and denied the government's request for a four-level adjustment under section 3B1.1(a).  Nevertheless, the court found that Cali's role in Yerardi's gambling enterprise warranted some enhancement in his sentence and concluded, over Cali's objection, that a three level increase in the offense level was appropriate. It found that section 3B1.1(b) and Application Note 2's role in the offense provisions permitted him to make a direct adjustment to Cali's base offense level, but added that, should this Court determine that section 3B1.1 does not permit such an adjustment, it would employ an upward departure, under United States v. Rivera, 994 F.2d 942 (1st ________________________ Cir. 1993), to impose a sentence outside the range prescribed by the Guidelines to reach the same final sentence. Either calculus results in a total adjusted offense level of thirteen, which corresponds to a sentencing range of twelve to eighteen months. Accordingly, the court sentenced Cali to a fifteen- month term of imprisonment and two years of supervised release. It assessed Cali $50.00, as required by statute, -7- 7 and imposed a fine of $3,000.00, without interest. In light of Cali's medical problems, the court also made a recommendation that Cali be placed in a facility, as close to Massachusetts as possible, where adequate medical treatment would be available to him.  III. III. STANDARD OF REVIEW STANDARD OF REVIEW __________________ Appellate review of a district court's application of the Guidelines is a two-part process. United States v. ________________ Joyce, 70 F.3d 679, 681 (1st Cir. 1995), cert. denied, 116 S. _____ _____ ______ Ct. 1556 (1996). We first determine the applicability of the guideline to a particular case de novo. United States v. __ ____ _________________ McCarthy, 77 F.3d 522, 535 (1st Cir. 1996); United States v. ________ ________________ St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992). After _________ determining the guideline's scope and meaning, we review the district court's factual determinations for clear error, "giv[ing] due deference to the district court's application of the guidelines to the facts." Joyce, 70 F.3d at 681; see _____ ___ also Koon v. United States, Nos. 94-1644, 94-8842, 1996 WL ____ ______________________ 315800 at * 8 (U.S. June 13, 1996); McCarthy, 77 F.3d at 535; ________ St. Cyr, 977 F.2d at 701. Because "[t]he determination of a ________ defendant's role in an offense is fact-specific," Joyce, 70 _____ F.3d at 682, we will only disturb the district court's findings regarding Cali's role in Yerardi's gambling enterprise if they are clearly erroneous or based on a -8- 8 mistake of law. See United States v. Frankhauser, 80 F.3d ___ _____________________________ 641, 653 (1st Cir. 1996); United States v. Rostoff, 53 F.3d ________________________ 398, 413 (1st Cir. 1995); United States v. Tejada-Beltran, 50 _______________________________ F.3d 105, 110-11 (1st Cir. 1995). IV. IV. DISCUSSION DISCUSSION __________ The small, but nevertheless real, difference between a twelve and fifteen month prison term is ultimately what is at stake in this appeal. Cali contends that he is entitled to a reduction in his fifteen-month sentence because twelve months is the maximum prison term he should have received under the Guidelines. In support of this, he maintains that the district court erroneously concluded that section 3B1.1(b) permits a base offense level enhancement in the absence of a finding that a defendant organized, lead, managed, or supervised one or more participants in an illegal enterprise involving five or more participants. Additionally, Cali argues that the court's alternative holding -- that an upward departure was appropriate in the event section 3B1.1 precluded adjustment -- was clearly erroneous because his conduct falls squarely within the heartland of 18 U.S.C. 1955 offenses. We begin by reviewing the claim that, absent a finding that a defendant managed individuals, U.S.S.G. 3B1.1(b) precludes an -9- 9 enhancement in the base offense level and discuss the requirements for a 3B1.1 upward departure thereafter. U.S.S.G. 3B1.1(b) Role in the Offense Adjustments U.S.S.G. 3B1.1(b) Role in the Offense Adjustments ___________________________________________________ U.S.S.G. 3B1.1 punishes defendants in large-scale criminal enterprises according to their relative responsibility, meting out the most severe sentences to individuals who hold leadership or management positions. Tejada-Beltran, 50 F.3d at 111; United States v. Fones, 51 ______________ _______________________ F.3d 663, 665 (7th Cir. 1995); United States v. Parmelee, 42 _________________________ F.3d 387, 395 (7th Cir. 1994), cert. denied sub nom. Brozek- _____ ______ ___ ____ _______ Lukaszuk, 116 S. Ct. 63 (1995). The district court used this ________ guideline to elevate Cali's sentence on the theory that section 3B1.1(b) permits an enhancement in a defendant's base offense level for both management of individuals and assets. Cali assigns error, contending that an enhancement in base offense level can only be based on a finding that the defendant managed other individuals. The government concedes this point, but maintains that Cali's argument is moot because the district court found that Cali's responsibilities in Yerardi's gambling business included managing individuals, as well as assets. To make sense of these positions, we briefly review section 3B1.1 and its history. Section 3B1.1 provides: Based on the defendant's role in the offense, increase the offense level as follows: -10- 10 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels. (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels. (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels. Prior to 1993, courts were split as to whether a finding that a criminal-enterprise defendant managed individuals was a prerequisite to a section 3B1.1 base offense level adjustment. See United States v. McFarlane, 64 F.3d 1235, ___ ___________________________ 1237 (8th Cir. 1995). This Circuit took the view that "the defendant must have exercised some degree of control over others involved in the commission of the offense or . . . must have been responsible for organizing others for the purpose of carrying out the crime." United States v. Fuller, _______________________ 897 F.2d 1217, 1220 (1st Cir. 1990); see also United States ___ ____ _____________ v. Fuentes, 954 F.2d 151, 153 (3d Cir.), cert. denied, 504 ___________ _____ ______ U.S. 977 (1992); United States v. Mares-Molina, 913 F.2d 770, _____________________________ 773 (9th Cir. 1990). Other courts concluded that "a defendant who did not supervise people [could] be considered a manager or supervisor within the meaning of 3B1.1(b)." United States v. Chambers, 985 F.2d 1263, 1267 (4th Cir.), __________________________ -11- 11 cert. denied, 114 S. Ct. 107 (1993); see also United States _____ ______ ___ ____ _____________ v. Grady, 972 F.2d 889 (8th Cir. 1992). ________ On November 1, 1993, the Sentencing Commission ("Commission") weighed into this debate by issuing Amendment 500, which amended section 3B1.1 to include Application Note 2. That application note provides:  To qualify for an adjustment under this section, defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization. Thus, Amendment 500 offered something to courts on both sides of the section 3B1.1 debate. It made it clear, in accord with the position we embraced in Fuller, 897 F.2d at 1220, ______ that section 3B1.1 adjustments are unavailable unless the record shows that the defendant managed one or more individuals, but also states that a finding that a defendant managed assets instead of individuals could be a basis for upward departure. Ironically, this attempt to define section 3B1.1's contours and operation created the dispute which lies at the heart of this appeal.  Application Note 2 explains that section 3B1.1 adjustments and departures require different factual findings, but does not clarify how, if at all, these devices -12- 12 differ in terms of the sentencing calculation they mandate. At the sentencing hearing, Cali argued that section 3B1.1 adjustments involve enhancements in the base offense level, whereas section 3B1.1 departures involve enhancements in the total adjusted offense level and must adhere to the framework for Guidelines departures established by this Circuit in Rivera, 994 F.2d at 942. The district court agreed that ______ section 3B1.1 adjustments effectuate increases in a defendant's base offense level. See, e.g., United States v. ___ ____ ________________ Capers, 61 F.3d 1100, 1109 (4th Cir. 1995), cert. denied, No. ______ _____ ______ 95-7022, 1995 WL 752222 (U.S. May 20, 1996); Fones, 51 F.3d _____ at 669-70; McFarlane, 64 F.3d at 1239-40. It was not _________ persuaded, however, that the Commission intended to limit section 3B1.1 departures to changes in the total adjusted offense level: THE COURT: My primary view of the matter . . . is that the appropriate way to read these guidelines is that that word "departure" in Application Note 2 was not being used in the technical sense of a kind of departure that is controlled by Rivera, by the decision-making structure ______ controlled by Rivera. Instead it's ______ talking about a calculation of the total offense level.  The court reasoned that had the Commission intended the term "departure" to have the same meaning in the role in the offense context as it does elsewhere in the Guidelines, it would have discussed role in the offense departures in Chapter 5, Part K, of the Guidelines, which is explicitly -13- 13 devoted to departures, and not in Chapter 3, Part B, which primarily deals with base offense level adjustments. See ___ U.S.S.G. Chap. 3, Part B, Introductory Commentary ("This part provides adjustments to the offense level based upon the role the defendant played in committing the offense."). The district court, therefore, held that both section 3B1.1 adjustments and departures affect base offense level.  This was error. We cannot agree, given the circumstances surrounding the Commission's promulgation of Application Note 2, that the sentence-calculation difference between section 3B1.1 adjustments and departures "is . . . inconsequential." See McFarlane, 64 F.3d at 1239. Simply ___ _________ because role-in-the-offense departures are discussed in Chapter 3, Part B, instead of Chapter 5, Part K, is not persuasive evidence of an intent to treat section 3B1.1 adjustments and departures the same for sentence calculation purposes. See Rivera, 994 F.2d at 948 ("Specific individual ___ ______ guidelines may also encourage departures."). The language of Application Note 2 persuades us that the two devices are, in fact, different: section 3B1.1 adjustments are mandatory and subject to the tripartite test set out by that guideline, whereas departures made pursuant to that guideline are discretionary. As the Eighth Circuit explained in United ______ States v. McFarlane, 64 F.3d 1235, 1239 (8th Cir. 1995): ___________________ If the sentencing court concludes that a defendant has managed or supervised one -14- 14 or more participants in a criminal enterprise involving five or more total participants, an adjustment is mandated - - the court must enhance the defendant's sentence by three levels. If, on the other hand, the sentencing court concludes that the defendant has merely exercised a managerial role over the property, assets, or activities of a criminal enterprise involving five or more participants, the court is possessed of a certain degree of discretion regarding the enhancement of the defendant's sentence -- "[a]n upward departure may be warranted."  We hold that section 3B1.1(b) and Application Note 2 preclude "management responsibility over property, assets, or activities as the basis" for an enhancement to a defendant's base offense level. See United States v. ___ __________________ Greenfield, 44 F.3d 1141, 1146 (2d Cir. 1995). Because the __________ government contends that the factual predicate for a section 3B1.1(b) adjustment exists in this case, we do not immediately decide the question of whether section 3B1.1 departures must be analyzed under the Rivera framework. ______ Instead, we focus on whether the district court found that Cali managed one or more individuals in a criminal enterprise involving five or more participants and, if so, whether that finding was clearly erroneous. See Tejada-Beltran, 50 F.3d ___ ______________ at 110.  Section 3B1.1(b) only applies where the record shows that a defendant operated as a "manager or supervisor and the criminal activity involved five or more participants -15- 15 or was otherwise extensive." U.S.S.G. 3B1.1(b). Though the Guidelines provide a list of seven factors -- which is neither exhaustive nor imbued with "talismanic significance" -- to assist courts in determining whether a defendant acted as a leader or organizer within the meaning of section 3B1.1(a), United States v. Talladino, 38 F.3d 1255, 1260 (1st __________________________ Cir. 1994); see also Joyce, 70 F.3d at 683; Tejada-Beltran, ___ ____ _____ ______________ 50 F.3d at 111; U.S.S.G. 3B1.1, Application Note 4, they do not define "[t]he terms 'manager' and 'supervisor'." Joyce, _____ 70 F.3d at 682. In the past, we have required some "degree of control or organizational authority over others" to support a section 3B1.1(b) adjustment. Fuller, 897 F.2d at ______ 1220. Immediate or direct control over subordinates or partners, while certainly an important factor to consider, is not, however, a prerequisite to finding a defendant deserving of added culpability or punishment. See Frankhauser, 80 F.3d ___ ___________ at 654; Tejada-Beltran, 50 F.3d at 112; United States v. ______________ _________________ Payne, 63 F.3d 1200, 1212 (2d Cir. 1995), cert. denied, 116 _____ _____ ______ S. Ct. 1056 (1996); Greenfield, 44 F.3d at 1146-47. __________ "Managerial status [generally] attach[es] if there is evidence that a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person." United States v. ________________ Savoie, 985 F.2d 612, 616 (1st Cir. 1993); see also United ______ ___ ____ ______ States v. Munoz, 36 F.3d 1229, 1240 (1st Cir. 1994), cert. ________________ _____ -16- 16 denied sub nom. Martinez v. United States, 115 S. Ct. 1164 ______ ___ ____ __________________________ (1995); see also United States v. Webster, 54 F.3d 1, 8 (1st ___ ____ ________________________ Cir. 1995); United States v. Castellone, 985 F.2d 21, 26 (1st ___________________________ Cir. 1993).  The government contends that the court clearly found that Cali served as a manager or supervisor in the gambling enterprise and that this finding was adequately supported by the transcripts of the conversations between Yerardi and Cali intercepted by the State Police, Cali's acceptance of responsibility statement, and affidavits provided by State Trooper Tutungian. See Joyce, 70 F.3d at ___ _____ 682 (government must prove role in the offense by a preponderance of the evidence and may do so by relying on circumstantial evidence). Our review of the record, however, reveals that the court's findings on this issue were less than clear: there is a discrepancy between the findings the district court made from the bench at Cali's sentencing hearing and those it offered in its subsequent written judgment.  Transcripts of the sentencing hearing suggest that the court did conclude that Cali managed people and assets for Yerardi's gambling business: THE COURT: I find that the defendant's role was more than simply that of record keeper. He was that, as described in one part of the testimony that's been referred to as the trial of the Grabiec case, but that was not the limit of his -17- 17 participation. And it is my finding that he was also coordinating the efforts of others and the reports of others and putting that together and advising Yerardi about managerial decisions in the operation of this ongoing enterprise over a substantial length of time. Those findings, in my view, under an appropriate interpretation of the guidelines support a three-point upward adjustment in the calculation of the total offense level so as to raise that total offense level by three points from the way it was calculated by the presentence investigation report and thus move it up to 13.  But the written judgment summarizing the court's findings and decisions regarding the adjustments and departures requested by the government and Cali does not cite management or supervision of individuals as part of Cali's offense. It omits the reference to individuals and refers only to Cali's alleged  -18- 18 management of assets:  Government objection to failure of PSI to add four levels under 3B1.1(a) for alleged supervisory role is rejected, but I find (over defendant's objection) that an upward adjustment of 3 levels is appropriate under 3B1.1(b) and Application Note 2, because the defendant exercised a degree of management responsibility over property and assets, under the direction of the principal organizer and leader.  The government invites us to ignore this discrepancy and to focus instead on the district court's oral explanation of its sentencing decisionmaking. Ordinarily, we would accept such an invitation. "Where . . . [a] district court's oral expression of its sentencing rationale varies materially from its subsequent written expression of that rationale, appellate courts have tended to honor the former at the expense of the latter." United States v. Muniz, 49 _______________________ F.3d 36, 42 n.5 (1st Cir. 1995); see also United States v. ___ ____ _________________ Tramp, 30 F.3d 1035, 1037 (8th Cir. 1994); United States v. _____ _________________ Hicks, 997 F.2d 594, 597 (9th Cir. 1993); United States v. _____ ________________ Roberts, 933 F.2d 517, 519 n.1 (7th Cir. 1991)(citing cases); _______ United States v. Khoury, 901 F.2d 975, 977 (11th Cir. 1990). ________________________ We decline, however, to do so in this instance.  Because the written judgment and the district court's alternative holding -- that Cali's management of assets warranted an upward departure from the sentence prescribed under the Guidelines -- both focus on management -19- 19 of assets and do not mention management of individuals at all, we think it would be imprudent to adhere to the oral pronouncement made in this case. Furthermore, the need to resolve the conflict in the district court's 3B1.1 decisions by remanding for clarification or to decide whether the record could even support a finding that Cali managed individuals -- an issue about which we have considerable doubt -- is obviated by the existence of the secondary holding. It provides an alternative basis for upholding the fifteen-month sentence Cali received. We do not decide whether a sufficient factual predicate existed to find that the defendant was a manager of other individuals within the meaning of section 3B1.1. We proceed, instead, to a discussion of the district court's upward departure holding. U.S.S.G. 3B1.1(b) Role in the Offense Departures U.S.S.G. 3B1.1(b) Role in the Offense Departures __________________________________________________ As an alternative to its upward adjustment holding, the district court held that the asset management Cali conducted during his involvement in Yerardi's gambling business justified a three-level upward departure, under section 3B1.1(b), to impose a sentence corresponding to a total adjusted offense level of thirteen. The district court found that Cali operated as more than a bookie or mere record keeper and that the threats of violence which marked Yerardi's gambling and loansharking businesses took Cali's conduct outside the heartland of other section 3B1.1(b) -20- 20 offenses. Cali assigns error. He argues, first, that the facts of his case do not support a conclusion that he managed assets and, second, that the record, to the extent it reflects asset management at all, does not suggest that his conduct falls outside the heartland of section 3B1.1(b) offenses. See Rivera, 994 F.2d at 947. The government ___ ______ contends that Rivera's heartland analysis does not apply and ______ urges us to accept the district court's findings of fact. Before addressing these arguments, we discuss the rules pertaining to departures from sentences prescribed by the Guidelines. Prior to the Court's recent decision in Koon ____ v. United States, Nos. 94-1664, 94-8842, 1996 WL 315800 (U.S. ________________ June 13, 1996), appellate courts were expected to engage in a three-part departure analysis. See United States v. ___ ___________________ Campbell, 61 F.3d 976, 984 (1st Cir. 1995), cert. denied, 116 ________ _____ ______ S. Ct. 1556 (1996); Rostoff, 53 F.3d at 404; United States v. _______ ________________ Jackson, 30 F.3d 199, 202 (1st Cir. 1994). We first _______ conducted plenary review of whether the circumstances of the case were, in principle, of a kind that the Guidelines permitted the district court to consider, "with 'full awareness of, and respect for the trier's superior "feel" for the case' . . . ." Rivera, 994 F.2d at 951-52 (quoting ______ United States v. Diaz-Villafane, 874 F.2d 43, 50 (1st Cir. ________________________________ 1989)); see also United States v. Bennett, 60 F.3d 902, 904 ___ ____ _________________________ (1st Cir. 1995); United States v. Pelkey, 29 F.3d 11, 14 (1st _______________________ -21- 21 Cir. 1994). We then reviewed the district court's departure- related findings of fact for clear error. Pelkey, 29 F.3d at ______ 14. Finally, we assessed the reasonableness of the departure taken. Id. ___ Koon effectively merges the first and second stages ____ of our departure analysis into one, and instructs that our review of the legal conclusions and factual determinations underlying the district court's departure decision be conducted under a unitary abuse-of-discretion standard. See ___ Koon, 1996 WL 315800 at *9. "That a departure decision, in ____ an occasional case, may call for a legal determination does not mean, as a consequence, that parts of the review must be labeled de novo while other parts are labeled an abuse of discretion." Id. at *9-10. Thus, the analysis we must ___ conduct in evaluating departure decisions entails reviewing, under an abuse of discretion standard, the district court's determination that the case presents features that make it sufficiently unusual to take it out of the applicable guideline's heartland. See id. at *12. Abuse of discretion ___ ___ review necessarily "includes review to determine that the [district court's exercise of] discretion was not guided by erroneous legal conclusions." Id. at 10. Additionally, our ___ analysis, like our pre-Koon review process, requires us to ____ assess the reasonableness of the departure taken.  -22- 22 Decisions to depart from sentences prescribed by the Guidelines are generally only permitted in cases in which unusual or atypical circumstances justify individualizing a sentence more than the relatively narrow strictures that the Guidelines permit. United States v. Calderon, 935 F.2d 9, 11 _________________________ (1st Cir. 1991); see also Koon, 1996 WL 315800 at *7; 18 ___ ____ ____ U.S.C. 3553(b). In general, departure decisions fall into one of three categories: forbidden, discouraged, and encouraged. Grandmaison, 77 F.3d at 560. "Forbidden ___________ departures are those based, inter alia, on race, sex, _____ ____ national origin, creed, religion, or socioeconomic status." Id.; Rivera, 994 F.2d at 948-49; U.S.S.G. 5H1.10, 5H1.12. ___ ______ "The Sentencing Commission . . . has expressly precluded departure on these grounds, even where they make a case atypical or extraordinary." Grandmaison, 77 F.3d at 560. ___________ "Discouraged departures involve factors which were considered by the Commission--such as age, family ties and responsibilities, employment record, good works, or physical condition--but which present themselves to an extraordinary degree in a particular case." Id. "Encouraged departures, ___ in contrast, involve considerations not previously taken into account by the Commission." Id.  ___ The departure analysis "varies depending on the category in which the feature [or activity] justifying departure falls." United States v. DeMasi, 40 F.3d 1306, _________________________ -23- 23 1323 (1st Cir. 1994), cert. denied sub nom. Bonasia v. United _____ ______ ___ ____ _________________ States, 115 S. Ct. 947 (1995). Cali maintains that the ______ starting point for our review of the district court's departure decision must be an inquiry into whether his conduct was more egregious than that of other section 3B1.1(b) offenders. The government disputes this and contends that such an investigation is unnecessary in the role-in-the-offense context because section 3B1.1(b) departures are encouraged. We agree with the government.  Section 3B1.1 departures are clearly encouraged by the Commission. The language of Application Note 2 -- that "upward departure may be warranted . . . in the case of a defendant who . . . exercised management responsibility over the property, assets, or activities of a criminal organization" -- endorses management of assets as a permissible basis for upward departure. This endorsement and our determination that section 3B1.1 does not incorporate asset management as a sentencing factor lead us to the conclusion that the district court was authorized to depart without first engaging in the analysis Cali urges. Where the Commission has explicitly identified certain activities or conduct as a factor not adequately taken into account in its formulation of a particular guideline and that guideline does not incorporate that factor at all, we can be confident that the departure undertaken was not unreasonable. See Koon, ___ ____ -24- 24 1996 WL 315800 at *8; Rivera, 994 F.2d at 948; see also ______ ___ ____ United States v. Diaz-Martinez, 71 F.3d 946, 952-53 (1st Cir. ______________________________ 1995)(reviewing encouraged U.S.S.G. 2K2.1 upward departure); Rostoff, 53 F.3d at 406 (reviewing encouraged _______ U.S.S.G. 2F1.1 downward departure); United States v. __________________ Quinones, 26 F.3d 213, 218 (1st Cir. 1994)(reviewing ________ encouraged U.S.S.G. 5K2.8 upward departure). Resort to the "heartland" analysis generally reserved for discouraged departures is, therefore, unnecessary. See Koon, 1996 WL ___ ____ 315800 at *8; McFarlane, 64 F.3d at 1240; United States v. _________ ________________ Mendez-Colon, 15 F.3d 188, 190-91 (1st Cir. 1994)(Breyer, ____________ C.J.); compare DeMasi, 40 F.3d at 1323 (describing process _______ ______ for comparing cases involving discouraged reasons for departure). Management of a large-scale criminal enterprise's assets is conduct which, under Application Note 2 to section 3B1.1 and hence as a matter of law, places a defendant outside the heartland of offenses by individuals who participate in large-scale criminal enterprises but who do not manage assets. See Rivera, 994 F.2d at 948. ___ ______ Having concluded that the relevant circumstances of Cali's case constitute an encouraged basis for departure under the Guidelines, we proceed to the next stage in our analysis. Cali asserts that the district court erroneously found that he managed gambling assets. While Cali paints a persuasive picture of his role in Yerardi's gambling -25- 25 business, we cannot say that the district court abused its discretion. "[W]hen there are two plausible views of the record, the sentencing court's adoption of one such view cannot be clearly erroneous." St. Cyr, 977 F.2d at 706; see _______ ___ also Munoz, 36 F.3d at 1240; United States v. Brewster, 1 ____ _____ __________________________ F.3d 51, 55 (1st Cir. 1993); Savoie, 985 F.2d at 616. ______ The government presented evidence which was a solid basis for the district court to conclude that Cali managed assets and was more than a mere "bookie" or "telephone operator" in Yerardi's business. The record reveals that the information Cali recorded and analyzed was an asset or possession of great value to the gambling enterprise. See ___ Webster's II New Riverside University Dictionary 131 (1994). _________________________________________________ It also shows that Cali fielded calls from and placed bets for various agents, as a bookie might do, but also directly reviewed betting and makeup figures with the individual who presided over the gambling enterprise, Yerardi, and participated in "charting" -- i.e., assessing the organization's risk of loss. Compare Parmelee, 42 F.3d at _______ ________ 395 (control of plane inherent in role of pilot for criminal enterprise). Though Yerardi seems to have made the decisions about when and whom to chart, the record suggests that the responsibility for keeping the organization's records, calculating the business's risk of loss on particular events, and assisting Yerardi in assessing the organization's overall -26- 26 financial health primarily rested with Cali and his counterpart, DeAngelis. The transcripts of calls intercepted by the State Police, in particular, suggest that Cali exercised discretion or control over the organization's information and that Yerardi heavily relied on Cali's expertise and special knowledge of the business's operations. We, therefore, do not think the district court's conclusion that Cali managed assets or enjoyed executive status within the gambling enterprise implausible.  Nor do we think the extent of the departure taken by the district court unreasonable. Quinones, 26 F.3d at ________ 219. The three-level upward departure taken from the sentence tabulated under the Guidelines represents a three- month increase in the maximum sentence Cali could have received and an even smaller increase in the actual time Cali will serve in prison. Because of this, the reasons given for the upward departure, and the deference due the special feel the district court developed for this case in presiding over the legal proceedings for Cali's co-conspirators, we find that the upward departure the district court imposed was reasonable. See Rostoff, 53 F.3d at 409 (judgment call for ___ _______ decision regarding extent of departure is ultimately the district court's).  V. V. CONCLUSION  CONCLUSION __________ -27- 27 For the foregoing reasons, Cali's fifteen-month sentence of imprisonment is affirmed.  affirmed ________ -28- 28