USCA1 Opinion

 

 For the First Circuit ____________________ No. 96-2002 UNITED STATES, Appellee, v. ANTHONY J. RIZZO, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Cyr, Senior Circuit Judge, and Stahl, Circuit Judge. ____________________ James H. Budreau for appellant. John M. Griffin , Assistant United States Attorney, with whom  Donald K. Stern, United States Attorney, was on brief for appellee. ____________________ August 11, 1997 ____________________ STAHL,  Circuit Judge . Defendant-appellant Anthony J. Rizzo appeals the thirty-seven month sentence that the district court imposed upon him after he pleaded guilty to several counts involving possessing, negotiating, and uttering counterfeit securities in violation of 18 U.S.C. SS 371, 513. Finding no merit to Rizzo's arguments, we affirm.  Facts We consider the facts as set forth in "the presentence report, the sentencing transcript[,] and various other materials before the district court." United States v. Gill, 99 F.3d 484, 485 (1st Cir. 1996). The counterfeit scheme in which Rizzo was involved was designed to operate as follows: Rizzo supplied counterfeit checks to Ronald A. Moore, who forwarded them to Joseph Savarese. The checks were made payable to Savarese's business, Thermal Shield of New England ("Thermal Shield"). Savarese was to deposit the counterfeit checks in his business' bank accounts and then withdraw the funds after the checks had cleared. Rizzo, Moore, and Savarese were to share in the illegal proceeds from the counterfeit checks.  During the course of the scheme in 1992, Rizzo provided Savarese with five checks that were fraudulent reproductions of actual corporate checks. Moore operated as the middleman between Rizzo and Savarese for the first three checks; Rizzo dealt directly with Savarese for the final two -2- 2 checks. The companies whose checks had been counterfeited neither issued these checks nor authorized the disbursement of any funds to Thermal Shield. In April 1992, Rizzo, Moore, and Savarese conducted their first illegal transaction. Moore gave Savarese a $160,00.00 counterfeit check that Rizzo had provided him listing Thermal Shield as payee and Hasbro, Inc. as payor. Savarese then deposited the counterfeit check into the Thermal Shield account at the Winthrop, Massachusetts branch of New World Bank and delivered the deposit slip to Moore. After the check cleared, Savarese withdrew the $160,000.00 proceeds from the check. There being little honor among the dishonest, it was not until Moore made threatening statements to Savarese on several occasions that he provided Moore with approximately $40,000.00 of the illicit proceeds to be shared with Rizzo as their portion of the illegal booty. Prior to the Hasbro check transaction, for reasons not entirely clear in the record, Savarese had contacted agents of the Federal Bureau of Investigations ("FBI") concerning the counterfeit check scheme. The FBI agents instructed Savarese that under no circumstances was he to become involved with the Hasbro check. Savarese did not follow these instructions, and the FBI agents subsequently discovered Savarese's participation in negotiating the first counterfeit check. Following the Hasbro check transaction, Savarese began cooperating with the -3- FBI in connection with the Bureau's investigation of the counterfeit check scheme. During this time, the FBI, with the knowledge of Savarese and the assistance of security officials at the Bank of Boston, established a "shell" account in the name of Thermal Shield at the Bank of Boston. Emboldened by their success with the Hasbro check, Rizzo, Moore, and Savarese agreed to negotiate additional counterfeit checks drawn on unsuspecting corporations. On June 2, 1992, Moore gave Savarese two counterfeit checks from Rizzo; one in the amount of $47,750.00 naming New Wave Transport (U.S.A.) as payor and one in the amount of $47,785.00 naming The American Experience West Corp. as payor. Savarese deposited the checks in the Thermal Shield account at the Bank of Boston and delivered the deposit slip to Moore. On June 9, 1992, upon Moore's urging, Savarese visited the Bank of Boston in an effort to withdraw the funds from the two counterfeit checks. By previous arrangement between the FBI and the Bank of Boston, the teller furnished Savarese with a letter stating that his account was closed. On July 1, 1992, Savarese met directly with Rizzo. During one conversation, Rizzo told Savarese that they would "do two more." Several days later, Rizzo gave Savarese two new counterfeit checks, one in the amount of $9300.00 naming the Great Atlantic and Pacific Tea Company, Inc. as payor and one -4- 4 in the amount of $9,275.00 naming Waldbaum, Inc. as payor. The conspirators never negotiated either of these two checks. Procedural Background On December 14, 1995, a federal grand jury returned a three-count superseding indictment alleging that Rizzo engaged in a counterfeit check scheme. The indictment stated that Rizzo illegally conspired with co-defendant Ronald A. Moore and others to obtain cash through the negotiation of counterfeit corporate securities, in violation of 18 U.S.C. S 371. The indictment further alleged two counts of uttering and possessing counterfeited securities of a corporation, in contravention of 18 U.S.C. S 513. On May 10, 1996, Rizzo entered a plea of guilty to all three counts. Following Rizzo's plea, the United States Probation Officer prepared a Presentence Report, which recommended an adjusted offense level of sixteen for Rizzo's participation in the counterfeit check scheme. The base offense level under U.S.S.G. S 2F1.1 was six and the Report suggested several enhancements. First, the Report recommended an eight-level increase because the intended loss from the scheme exceeded $200,000.00. See U.S.S.G. S 2F1.1(b)(1)(I). The Presentence Report calculated the amount of loss under  1. On December 14, 1993, Savarese was convicted and sentenced to sixty-three months imprisonment. Savarese's conviction and sentence reflected his involvement in the negotiation of the Hasbro check.  -5- 5 U.S.S.G. S 2F1.1 by using the actual loss of $160,000.00 from the Hasbro check and adding the intended loss of $113,950.00, representing the total of the four other checks involved in the scheme. The next suggested enhancement entailed a two-level increase, which reflected the fact that the offense involved more than minimal planning. See U.S.S.G. S 2F1.1(b)(2)(A). Finally, the Presentence Report recommended a three-level increase because Rizzo committed the offense while awaiting sentencing on a 1992 federal conviction.  See U.S.S.G. S 2J1.7. The Presentence Report recommended reducing the resulting offense level of nineteen to sixteen because Rizzo demonstrated acceptance of responsibility. See U.S.S.G. S 3E1.1(a),(b)(2). The Presentence Report computed Rizzo's criminal history category as a IV. This computation included Rizzo's 1992 federal conviction for negotiating counterfeit checks and using stolen credit cards and false identification, for which he had been sentenced to thirty-three months' imprisonment on September 17, 1992. Rizzo completed the sentence on February 3, 1995, at which time he began a period of supervised release. Rizzo's criminal history computation also reflected a 1989 conviction in Charlestown District Court for possession of a firearm without proper identification. -6- 6 Rizzo filed numerous objections to the Presentence Report. Of importance for purposes of this appeal, Rizzo argued for a downward departure, asserting that his case fell outside the heartland of the Guidelines because he was unable to request concurrent federal sentences due to the fact that the thirty-three month sentence imposed in September 1992 had been discharged by the time he was indicted in this case. In support of this assertion, Rizzo advanced two arguments: first, he contended that the government purposefully delayed the indictment in the instant case until after he completed his thirty-three month sentence for his 1992 conviction in order to circumvent U.S.S.G. S 5G1.3(c); second, he claimed that the government was aware of the instant counterfeit check offenses when he was sentenced in September 1992 for his prior crimes, but improperly failed to inform the district court of the new offenses at the 1992 sentencing so that the sentencing judge could consider them as relevant conduct. According to Rizzo, if the government properly had informed the court of the relevant conduct involving this case, the court then "would have combined the two cases." If the court had combined the two cases, this process would have "result[ed] in a level 20  2. Rizzo lodged a total of nine objections to the Presentence Report. We discuss only those arguments which bear upon the subject matter of this appeal. -7- 7 for the combined cases." A level twenty carries a sentencing range of thirty-seven to forty-six months, which is at least twenty-four and potentially thirty-three months shorter than the total of seventy months Rizzo received on the two separate indictments. Also of importance for purposes of this appeal, Rizzo insisted that he should not have been subject to an eight-level increase reflecting the intended loss. According to Rizzo, the $273,950.00 of counterfeit checks involved in the scheme were "generated through a government sting operation," and, thus, "no loss was capable of occurring as a matter of law." On July 19, 1996, following an hour-long sentencing hearing at which Rizzo voiced his objections to the Presentence Report, the district court (Gorton, J.) accepted the recommendations contained in the Report and declined to depart downward from the suggested adjusted offense level of sixteen. The district court sentenced Rizzo to thirty-seven months' imprisonment and three years of supervised release. Thirty- three months of the imprisonment term were to run concurrently  3. Given our disposition of this appeal, we need not recite the process Rizzo set forth to arrive at a total offense level of twenty. 4. An offense level of sixteen permits the sentencing judge to sentence the defendant to a period of incarceration ranging from thirty-three months to forty-one months. The sentence that Judge Gorton imposed in this case (thirty-seven months) thus falls precisely in the middle of the possible incarceration terms Rizzo faced at sentencing. -8- 8 on counts one, two, and three, and four months of the term were to run consecutively, pursuant to 18 U.S.C. S 3147. The district court also ordered Rizzo to pay $12,500 in restitution. Standard of Review "[O]ur review of the legal conclusions and factual determinations underlying the district court's departure decision [is] . . . conducted under a unitary abuse-of- discretion standard." United States v.  Cali, 87 F.3d 571, 580 (1st Cir. 1996). "Abuse of discretion review necessarily 'includes review to determine that the [district court's exercise of] discretion was not guided by erroneous legal conclusions.'" Id. (quoting  Koon v.  United States , 116 S. Ct. 2035, 2045 (1996)). When the issue is whether or not the district court believed it had authority to depart, we have held that "[w]hat the district court thought was the scope of its authority [to depart from the guidelines] is perhaps a question of fact, but it is one that we must answer ourselves, by reviewing the sentencing transcript. Whether the district court's belief was mistaken is plainly a legal question that we  5. 18 U.S.C. S 3147 concerns "person[s] convicted of an offense committed while released pursuant to this chapter," and provides that "[a] term of imprisonment imposed pursuant to this section shall be consecutive to any other sentence of imprisonment." As noted above, at the time Rizzo committed the crimes underlying this appeal, he was on release awaiting sentencing for his 1992 conviction.  -9- 9 review de novo." United States v. Saldana, 109 F.3d 100, 103 (1st Cir. 1997). "Appellate review of a district court's application of the Guidelines is a two-part process. We first determine the applicability of the guideline to a particular case de novo. After determining the guideline's scope and meaning, we review the district court's factual determinations for clear error, 'giv[ing] due deference to the district court's application of the guidelines to the facts.'"  Cali, 87 F.3d at 575 (internal citations omitted) (quoting United  States v. Joyce, 70 F.3d 679, 681 (1st Cir. 1995), cert. denied, 116 S. Ct. 1556 (1996)). Discussion On appeal, Rizzo advances two arguments that he raised both in his objections to the Presentence Report and during his sentencing hearing. First, he contends that the district court erred when it denied his request for a downward departure pursuant to U.S.S.G. S 5K2.0 and U.S.S.G. S 5G1.3(c)  6. U.S.S.G. S 5K2.0 provides in pertinent part: "Under 18 U.S.C. S 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" 7. U.S.S.G. S 5G1.3(c) states: "(Policy Statement) In any other case, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a -10- 10 because "the record in the instant case fails to reveal whether the court understood that the present case fell outside of the guideline's heartland and that it had the discretion to depart downward." Second, Rizzo insists that the district court arrived at an incorrect adjusted offense level because it misapplied U.S.S.G. S 2F1.1 in calculating the loss attributable to him. We address Rizzo's arguments in turn. A. Downward Departure As we previously have stated, "a criminal defendant cannot ground an appeal on the sentencing court's discretionary decision not to depart below the GSR. . . . [A]ppellate jurisdiction[, however,] may attach if it appears that the failure to depart stemmed from the sentencing court's mistaken impression that it lacked the legal authority to deviate from  reasonable punishment of the instant offense." Rizzo bases much of his argument on a snippet of commentary to this section stating "[d]eparture would be warranted when independent prosecutions produce anomalous results that circumvent or defeat the intent of the guidelines." This commentary, however, was deleted from the Guidelines in 1989. Because Rizzo was sentenced in 1996, the November 1995 Guidelines apply to this case. See  United States v.  DiSanto, 86 F.3d 1238, 1254 n.26 (1st Cir. 1996), cert. denied, 117 S. Ct. 1109 (1997); United  States v. Springer, 28 F.3d 236, 237 (1st Cir. 1994). Moreover, there is no  ex  post  facto problem because S 5G1.3(c) did not change after Rizzo committed the offenses underlying this appeal. See  United States v.  Aymelek, 926 F.2d 64, 66 n.1 (1st Cir. 1991). 8. U.S.S.G. S 2F1.1(b)(1) concerns increases to the base offense level of six applicable to offenses involving fraud or deceit and necessitates increases to this base offense level depending on the amount of loss resulting from the fraud or deceit.  -11- 11 the guideline range." United States v. Gifford, 17 F.3d 462, 473 (1st Cir. 1994). Rizzo asserts both that the district court believed that it lacked the legal authority to depart and that the court's belief was mistaken. The record reveals little to buttress his assertion that the district court believed it lacked authority to depart downward. To support his assertion that the district court was mistaken, Rizzo contends that a court may depart downward pursuant to U.S.S.G. S 5G1.3(c) and U.S.S.G. S 5K2.0 when the government delays an indictment until after a defendant completes a previous federal sentence or when the government "had full knowledge of the facts and circumstances related to the instant case prior to the sentencing in that previous case" but failed to apprise the court of such facts and circumstances.  9. Specifically, Rizzo points to the following question that the district court asked during the sentencing hearing as evidence that the court believed it lacked authority to depart: "Do you have any law, statutory or otherwise in this regard, that requires the government to call such relevant conduct to the attention of the sentencing court?" Rizzo's counsel then directed the court to a section of the commentary to U.S.S.G. S 5G1.3 that was deleted in 1989: "[A] departure would be warranted when independent prosecutions produce anomalous results that circumvent or defeat the intent of the guidelines." See supra note 7. The court then responded by questioning Rizzo's counsel about this commentary: "It ought to be in the guideline manual, shouldn't it?" The court ultimately denied Rizzo's request for a downward departure, stating: "To the extent that this is in support of a motion for a downward departure, that motion is denied." From this interchange, Rizzo concludes that the district court did not think that it possessed the authority to depart downward.  -12- 12 "We are obliged to review a trial court's actions as they are made manifest in the record." United  States v. Tavano, 12 F.3d 301, 304 (1st Cir. 1993);  see  United States v. Morrison, 46 F.3d 127, 130 (1st Cir. 1995) ("When determining whether the sentencing court merely refused to exercise its discretionary power to depart, we consider the totality of the record and the sentencing court's actions as reflected therein."). The record in this case does not support Rizzo's claim that the district court believed it lacked authority to depart downward. Rizzo, both in his objections to the Presentence Report and during his sentencing hearing, clearly enunciated his position that his case fell outside the heartland of the guidelines and thus warranted a downward departure pursuant to U.S.S.G. S 5K2.0 and U.S.S.G. S 5G1.3. During the sentencing hearing, for instance, Rizzo's counsel explained that "[a]ll of this is, even the reference to . . . 5G.3 is in reference to a downward departure. . . . And, again, I think, because of the facts, it does take it out of the heartland of the guidelines." During the course of the sentencing hearing, the district court questioned Rizzo's counsel concerning this argument. The court repeatedly manifested its understanding of Rizzo's argument, initially stating: "you argue that under Sections 5G1.3 and 5G1.2, pertaining to the sentencing on multiple counts of conviction, that the present offense should run -13- 13 concurrently with Mr. Rizzo's prior offense. Is that basically it?" Later in the discussion, the court asked Rizzo's counsel, "Do you have any law, statutory or otherwise, that will guide the Court in this regard, that requires the government to call such relevant conduct to the attention of the sentencing court?" After Rizzo's counsel presented his argument and the district court subjected him to questioning, the government responded to Rizzo's argument at length during the sentencing hearing. After listening to both parties on the subject of a downward departure pursuant to U.S.S.G. S 5K2.0 and U.S.S.G. S 5G1.3, the district court ruled: "To the extent that that is in support of a motion for a downward departure, that motion is denied." "[I]f a district court desired to depart but thought this course forbidden by explicit guideline language, one would expect the court to cast its refusal in these terms." United States v. DeCosta, 37 F.3d 5, 8 (1st Cir. 1994); see United States v. Grandmaison, 77 F.3d 555, 565 (1st Cir. 1996) (indicating that if the record is ambiguous concerning the district court's awareness of its discretion to depart downward, "that ambiguity, without more, would not be enough to make the district court's refusal to depart appealable"). In this case, unlike in DeCosta, the district court made absolutely no remark that could be construed to indicate that -14- 14 it thought it lacked the authority under the guidelines to depart downward. [W]e have suggested that a sentencing court state, where appropriate, "that it has considered the mitigating factors urged but does not find them sufficiently unusual to warrant a departure in the case at hand." If a sentencing court neglects to use such language, however, the sentencing decision is not necessarily ripe for remand or review. Sentencing courts  have  had  abundant  opportunity  to become  experienced with the Guidelines and familiar  with  their  authority  to  make discretionary decisions regarding whether to depart. Morrison, 46 F.3d at 132 (internal citations and footnote omitted) (emphasis added) (quoting ( DeCosta, 37 F.3d at 8). As in  Morrison, "viewed in harmony with its context, the [district court's decision not to] depart[] reflects no misapprehension on the part of the district court as to its departure power, but simply its decision not to exercise that power in the present case." Id. at 132-33; see United  States v. DiIorio, 948 F.2d 1, 9 (1st Cir. 1991) ("[W]e think it apparent from this record that the court understood its authority to depart downward[], and yet concluded . . . that the specific provisions of the Guideline that DiIorio wished to invoke simply did not permit departure under the circumstances of her case.").  10. While we do not believe the record supports Rizzo's contention that the district court did not understand that it had authority to depart downward in this case, we note that the district court could have avoided much trouble in this case if -15- 15 Because we find that the record contains no evidence that the district court believed it lacked authority to depart downward in this case, we pause only briefly to address Rizzo's arguments supporting his plea for such a departure. Initially, we note that with respect to his contention that U.S.S.G. S 5G1.3 provided authority for the district court to depart downward, S 5G1.3 applies only to "undischarged terms of imprisonment." See  United States v.  McHan, 101 F.3d 1027, 1040 (4th Cir. 1996), cert. denied, No. 96-8994, 1997 WL 275967 (June 16, 1997);  Prewitt v.  United States , 83 F.3d 812, 817-18 (7th Cir. 1996). In this case, Rizzo had discharged the thirty-three month term of imprisonment resulting from his 1992 convictions prior to being sentenced for his 1995 federal indictment. Similarly, Rizzo's argument that the government improperly delayed indicting Rizzo until he served his thirty- three month term of imprisonment for the 1992 convictions is unavailing in light of  United States v.  Saldana, 109 F.3d 100, 104 (1st Cir. 1997). In  Saldana, a federal grand jury indicted the appellant following his release after serving twenty months of a thirty-month state sentence. The federal grand jury  it had heeded the suggestions of DeCosta and Morrison. See DeCosta, 37 F.3d at 8 (suggesting that the "district court say--where this is the case--that it has considered the mitigating factors urged but does not find them sufficiently unusual to warrant a departure in the case at hand");  Morrison, 46 F.3d at 132 (same).  -16- 16 indicted the appellant based on conduct that occurred approximately two years previously, prior to his conviction and sentencing in the state case. The district court sentenced the appellant to seventy months' imprisonment. See id. at 102. The appellant claimed, inter alia, that "if he had been charged with the federal offense while still serving his state sentence, the federal sentence would, under U.S.S.G. S 5G1.3(c), have been set to run concurrently with the state sentence." Id. In Saldana, we reasoned that "deliberate tampering to increase a sentence would be a concern, but the ordinary accidents of acceleration or delay are part of the fabric of criminal proceedings." Id. at 104. Affirming appellant's sentence, we held that "in the present case, the delay was neither extreme nor implicitly sinister." Id.  As in Saldana, nothing in the record indicates that the delay in this case was sinister. Rizzo indicated that he possessed no evidence concerning the government's motive in waiting to indict him until 1995. During the sentencing hearing, in fact, Rizzo's counsel conceded "I'm not pointing the finger at the government in terms of its conduct." Furthermore, in light of the precedent in this circuit, we do not believe that the delay in this case was "extreme." See Saldana, 109 F.3d at 102-04 (involving two-year delay);  United States v.  McCoy, 977 F.2d 706, 711 (1st Cir. 1992) (finding no -17- 17 due process violation in case of three and one-half year delay between conduct at issue and return of federal indictment). Rizzo's contention that the government knew of the facts of the offenses underlying this appeal at the time of his 1992 sentencing and improperly withheld this information from the sentencing court also is unpersuasive. We previously have explained: Undercover operations comprise a valuable, and generally lawful, weapon in the government's ar[senal]. Thus, courts should proceed with caution in staking out rules that will hinder government agents who seek lawfully to set such ruses in motion. "Despite the fact that undercover operations by their nature involve elements of furtiveness, duplicity, and manipulation, we have never held that such initiatives are per se unfair. To the contrary, we think that the Executive Branch is free, within  broad  limits, to set such snares for unwary criminals." United  States v. Gibbens, 25 F.3d 28, 31 (1st Cir. 1994) (internal citations omitted) (emphasis added) (quoting United States v.  Gifford, 17 F.3d 462, 470-71 (1st Cir. 1994)). Given the wide latitude we afford the government in conducting sting operations, "the burden of showing sentencing factor manipulation [necessarily] rests with the defendant. As with other fact-sensitive sentencing issues, the burden of proof must be carried by a preponderance of the evidence." Gibbens,  11. Particularly in light of Rizzo's failure to provide an adequate explanation, we agree with the government that Rizzo's non-disclosure argument essentially constitutes an accusation of sentencing factor manipulation on the part of the -18- 18 25 F.3d at 31-32 (internal citations omitted); see United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995) (indicating that the "standard is very high" and cautioning that "garden variety manipulation claims are largely a waste of time"). In this case, Rizzo offered no evidence whatsoever of any bad faith on the government's behalf. During Rizzo's sentencing hearing, his counsel explicitly stated that he did not have evidence concerning the government's motive in protecting the information pertaining to Rizzo's "relevant conduct" during the 1992 sentencing. At one point, Rizzo's counsel admitted: "I can't probe into the minds of the government at the time." Later in the hearing, Rizzo's counsel explained: "[W]e can't speculate about whatever the reasons were for the government not raising it at that time."  Rizzo also failed to direct the district court (and now fails to point this court) to any authority requiring the government to "call such relevant conduct to the attention of the sentencing court." For its part, the government explained that it did not reveal Rizzo's "relevant conduct" to the 1992  government. See United  States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995) (indicating that sentencing factor manipulation encompasses "vast range of circumstances"); United  States v. Connell, 960 F.2d 191, 196 n.8 (1st Cir. 1992) ("Governmental misconduct that shapes the contours of the crime and thus delimits the available sentencing options . . . can, in a suitable case, furnish the basis for downward departure.");  see also United  States v. Okey, 47 F.3d 238, 240 (7th Cir. 1995) ("Sentencing manipulation occurs when the government engages in improper conduct that has the effect of increasing a defendant's sentence."). -19- 19 sentencing court because it "had a specific investigative plan . . . to move from Mr. Rizzo to . . . find out who the participants were in this counterfeit check ring who were spreading [fraudulent] paper all throughout the city." This explanation is plausible given the record in this case and particularly Rizzo's numerous references to others in the scheme to whom he was responsible. See  Gibbens, 25 F.3d at 31 (crediting government's explanation that it "was hoping, based on appellant's allusions to a supposed business partner, to land a bigger fish"). We thus find that the district court did not commit an abuse of discretion in refusing to depart downward on the grounds that the government somehow manipulated Rizzo's 1992 sentence; Rizzo simply failed to carry his burden of proof with respect to his allegation of sentencing factor manipulation. See id. at 32; Montoya, 62 F.3d at 4. B. Loss Calculation The district court sentenced Rizzo based on the total $273,950.00 value of the five counterfeit checks given to Savarese in 1992. Pursuant to U.S.S.G. S 2F1.1(B)(1)(I), the district court increased Rizzo's base offense level of six by eight levels because the loss involved in the scheme fell between $200,000.00 and $350,000.00. Rizzo objected to the eight-level increase both in his objections to the Presentence Report and during his sentencing hearing. Rizzo argued that the $273,950.00 was -20- 20 generated through a government sting operation. Distorting the record, Rizzo asserted that "all the checks were deposited into the government's shell corporation . . . . Therefore, Mr. Rizzo's guidelines should not be increased by 2F1.1(b)(1) as no loss was capable of occurring as a matter of law." Perhaps recognizing the flaw in his earlier assertion, on appeal Rizzo alters his argument slightly, insisting that he "should only have been responsible for at most $160,000 under S 2F1.1 since the other amounts were incapable of being lost and/or had not been completed as a substantive offense." Because a loss calculation of $160,000.00 necessitates a seven-level increase pursuant to U.S.S.G. S 2F1.1(b)(1)(H), rather than an eight- level increase pursuant to U.S.S.G. S 2F1.1(b)(1)(I), Rizzo maintained that his "total offense level should have been 15 instead of 16." Rizzo rests his argument that actual rather than intended loss represents the appropriate calculation for purposes of U.S.S.G. S 2F1.1(b)(1) on two cases,  United States v.  Galbraith, 20 F.3d 1054 (10th Cir.),  cert.  denied, 513 U.S. 889 (1994), and United  States v. Watkins, 994 F.2d 1192 (6th Cir. 1992). In Galbraith, the appellant contended that "because his offense was committed in response to an undercover sting operation structured so there was no possibility of loss to a victim, the intended or probable loss was zero." Galbraith, 20 F.3d at 1059. Reasoning that "[b]ecause this was -21- 21 an undercover sting operation which was structured to sell stock to a pension fund that did not exist, defendant could not have occasioned any loss even if the scheme had been completed," the Tenth Circuit ruled that the applicable loss calculation for purposes of U.S.S.G. S 2F1.1(b)(1) was zero. Id.  The Galbraith court's rationale is inapplicable to this case. Unlike the fictitious victim in Galbraith, the intended victims of Rizzo's counterfeit check scheme were actual corporations. Moreover, the fact that the conspirators managed to deposit the first check and then to withdraw the entire $160,000.00 demonstrates that Rizzo could have "occasioned" a loss "if the scheme had been completed" with respect to the remaining four checks. If, for instance, Savarese again had determined to flout the FBI's instructions, it appears that the conspirators could have successfully negotiated the other checks totaling $113,950.00. As with  Galbraith, we find  Watkins' treatment of the appropriate loss calculation under U.S.S.G. S 2F1.1(b)(1) unpersuasive in the context of Rizzo's appeal. In  Watkins, the Sixth Circuit enunciated three factors that must be present for an amount of loss to be relevant under U.S.S.G. S 2F1.1: "First, as application note 7 instructs, the defendant must have intended the loss. Second, it must have been possible for the defendant to cause the loss. Third, the defendant must -22- 22 have completed or been about to complete but for interruption, all of the acts necessary to bring about the loss." Watkins, 994 F.2d at 1196. Contrary to Rizzo, we believe that these three factors were satisfied in this case. First, as Rizzo admits, he intended the $273,950.00 loss. Second, the conspirators' success with the $160,000.00 check demonstrates that it was possible for the defendant to cause the loss. Third, Rizzo provided Savarese with five checks totalling $273,950.00 and urged him to deposit these checks and then to remove the funds from the Thermal Shield account, thus "complet[ing] . . . but for interruption, all of the acts necessary to bring about the loss." We therefore find that even if the Watkins factors were dispositive of this appeal, the circumstances of this case were such that $273,950.00, not $160,000.00, would represent the proper figure for purposes of calculating loss pursuant to U.S.S.G. S 2F1.1(b)(1). Because Watkins does not guide our analysis of this issue, we add a few words about our interpretation of U.S.S.G. S 2F1.1(b)(1). Application Note 7 to U.S.S.G. S 2F1.1 states in pertinent part: "Consistent with the provisions of S 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." In this case, Rizzo admits that he intended to inflict $273,950.00 of loss. According to Application Note 7, therefore, -23- 23 $273,950.00 represents the appropriate amount for purposes of calculating loss under U.S.S.G. S 2F1.1 in this case. In United  States v. Egemonye, 62 F.3d 425, 428-29 (1st Cir. 1995), furthermore, we addressed the issue of intended loss in the context of U.S.S.G. S 2F1.1. The  Egemonye appellant was charged with conspiracy and other offenses relating to the possession and use of stolen credit cards.  See id. at 426. Pursuant to U.S.S.G. S 2F1.1(b)(1)(H), the district court computed the loss at $242,950.00, "representing the aggregate credit limit of the 51 credit cards purchased . . . in the four transactions," despite the fact that the appellant never inflicted any actual loss with many of the stolen credit cards that he purchased. Id. at 426-27. As in the instant case, the appellant was sentenced within the guidelines range to thirty-seven months' imprisonment.  See  id. at 427. Rejecting the appellant's argument that the district court's loss calculation based on the limits of all of the credit cards was "unrealistic," we concluded that on the "record the use of the aggregate card limits as a measure of intended and potential loss was [not] clearly erroneous." Id. at 429. We explained that "[w]here there is good evidence of actual intent and some prospect of success, we do not think that a court needs to engage in more refined forecasts of just how successful the scheme was likely to be." Id. -24- 24 Given the evidence of Rizzo's intent and the prospect of future success manifested by his initial success with the $160,000.00 check, we do not find that the district court's use of the $273,950.00 figure for purposes of calculating loss under U.S.S.G. S 2F1.1(b)(1) was clearly erroneous.  See  United States v. Carrington, 96 F.3d 1, 7 (1st Cir. 1996), cert. denied, 117 S. Ct. 1328 (1997); Egemonye, 62 F.3d at 429. Conclusion For the reasons stated above, we affirm the sentence that the district court imposed. -25- 25