# United States Court of Appeals
## For the First Circuit

No. 02-1986

UNITED STATES OF AMERICA,

Appellant,

v.

JOSE MALDONADO-MONTALVO,

Defendant, Appellee.

No. 02-2002

UNITED STATES OF AMERICA,

Appellant,

v.

WILFREDO PICON-RIVERA,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]
[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Lynch, Circuit Judge,

Cyr and Stahl, Senior Circuit Judges.

Robert D. McCallum, Jr., Assistant Attorney General, H.S. Garcia, United States Attorney, Douglas N. Letter, Attorney, Appellate Staff, and Matthew M. Collette, Attorney, Appellate Staff, on brief for appellant.

Raymond L. Sanchez Maceira on brief for appellees.

December 22, 2003

**CYR**, **Senior Circuit Judge**.    After appellants Jose Maldonado-Montalvo and Wilfredo Picon-Rivera were convicted of introducing adulterated milk into interstate commerce, the district court departed downward from their respective guideline sentencing ranges on the ground that much of the loss occasioned their victims was due to factors other than the wrongful conduct of the defendants.[1]    In sentencing Picon, the district court granted a further downward departure on the ground that he suffers from depression.   The government appeals and we once again vacate the erroneous departure rulings made by the district court.

## I

## BACKGROUND

For approximately four years — between 1993 and 1997 — Maldonado and Picon, licensed commercial dairy farmers, adulterated the milk which they sold to a nearby milk-processing plant by adding salt and water.   The salt served to increase the weight of the water which was added, thereby effectively disguising the dilution.   Moreover, the defendants "bought off" the truck drivers employed by the milk processor, in order to entice them to

---

[1]As the government elected to try Maldonado and Picon separately, each was sentenced by a different district judge. Since the facts in both cases are virtually identical, however, we consolidated the two government appeals. Further, the two sentencing judges employed virtually identical language in substantiating their "multiple causation" departures, and so for the sake of simplicity and convenience we quote exclusively from the sentencing transcript in the Picon case.

-3-

falsify their on-site quality test reports relating to the adulterated milk. Thus, at the plant the processor unwittingly mixed the milk which had been adulterated by the defendants with other regional milk supplies. As a consequence, the defendants received the Grade A milk price for their adulterated product.

Following their indictment, the defendants entered guilty pleas to the charge of delivering adulterated milk into interstate commerce, a felony. See 21 U.S.C. §§ 331(a), 333(a)(2). At sentencing,[2] the district court determined that each defendant was entitled to a downward departure due to the fact — as the district court found — that the loss calculation under U.S.S.G. § 2F1.1 (viz., which included all contaminated milk in the processor's silos) overstated the amount of loss attributable to their wrongful conduct. See U.S.S.G. § 2F1.1. Finally, the district court pointed to Picon's mental condition as a further basis for its downward departure. See U.S.S.G. § 5H1.3.[3]

---

[2]Earlier, the district court had sentenced these defendants on the premise that their respective offense levels should be 12, because they should only be held accountable for the contaminated milk delivered to the processing plant, rather than the total volume of milk in the silos contaminated by their adulterated milk. Those sentences were summarily vacated, then remanded for resentencing in light of United States v. Gonzalez-Alvarez, 277 F.3d 73, 78-79 (1st Cir. 2002) (holding that the total intended loss includes the entire silo contents).

[3]The district court departed downward from offense level 18 to level 12 in sentencing Picon, and from offense level 17 to 12 in sentencing Maldonado, thereby effectively reinstating their respective pre-remand sentences. See supra note 2.

On appeal, the government once again seeks to set aside the downward departure rulings made by the district court.[4] We now reverse and remand for resentencing, before a different judge, in accordance with this opinion and the accompanying order. See United States v. Muniz, 49 F.3d 36, 43 (1st Cir. 1995).

## II

## DISCUSSION

A departure ruling under the Sentencing Guidelines is reviewed de novo to determine whether it was based upon a factor that "(i) does not advance the objectives set forth in [18 U.S.C.] section 3553(a)(2);[5] or (ii) is not authorized under section

---

[4]The defendants originally filed no appellate briefs. In the interests of justice, we directed that counsel be appointed to represent them on appeal.

[5]Section 3553(a)(2) states:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider . . . the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

-5-

3553(b);[6] or (iii) is not justified by the facts of the case[.]" United States v. Frazier, 340 F.3d 5, 14 (1st Cir. 2003) (citation omitted).

## A.    The Downward Departure Based Upon "Multiple Causation"

In determining their respective sentences, the district court appropriately attributed to each defendant the entire loss; viz., the total value of all contaminated milk in the processor's silos.  See U.S.S.G. § 2F1.1(b)(1); United States v. Reeder, 170 F.3d 93, 109 (1st Cir. 1999) ("'[T]he victim loss table in U.S.S.G. § 2F1.1(b)(1) presumes that the defendant alone is responsible for

_____

[6]Section 3553(b) provides, in pertinent part:

[T]he court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [viz., the sentences as prescribed in the Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

18 U.S.C. § 3553(b).

-6-

the entire amount of victim loss specified in the particular loss range selected by the sentencing court.'") (citation omitted).[7] The Guidelines nevertheless permit a downward departure where the total loss calculation overstates the seriousness of the offense. See U.S.S.G. § 2F1.1, comment (n.11) (noting that "[in] a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense"); cf. U.S.S.G. § 2F1.1, comment. (n. 11) (1991) (noting that a "downward departure may be warranted" where the "total dollar loss that results from the offense may overstate its seriousness," which "typically occur[s]" when the defendant's fraud "is not the sole cause of the loss"). Theoretically, such a loss overstatement may occur where, inter alia, "[a]ny portion of the total loss sustained by the victim [is] a consequence of factors extraneous to the defendant's criminal conduct." Reeder, 170 F.3d at 109 (emphasis added); see also United States v. D'Andrea, 107 F.3d 949, 955-56 (1st Cir. 1997); United States v. Shattuck, 961 F.2d 1012, 1016-17 (1st Cir. 1992). As with any guideline departure, however, a "multiple causation" departure is permitted only if these extraneous factors are "of a kind, or [are present] to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the

---

[7]Effective November 2001, the Sentencing Commission deleted § 2F1.1, which specifically dealt with fraud offenses, and merged its provisions into § 2B1.1, which formerly dealt only with theft. These defendants, however, were sentenced pursuant to the pre-2001 version of the Sentencing Guidelines.

guidelines." 18 U.S.C. § 3553(b)(1); see supra note 6.

## 1. **Economic Hardship**

The district court in the instant case identified five extraneous factors. First, it stated:

> [A]s the dairy industry is a profit-driven entity, dairy farmers are assigned a monthly milk quota that must be maintained or they face the reality of negative financial consequences, to include, reduction or cancellation of the awarded quota. Less production by the farmer results in less profit for the processing plant, thus equates to financial disaster for the farmer. As such, caught in a bind to produce or face financial ruin, the farmers took the best of the bad options available.

The government in response aptly notes that a defendant's personal financial difficulties, as well as economic duress upon a defendant's trade or business, are explicitly prohibited as grounds for departure under the Sentencing Guidelines. U.S.S.G. § 5K2.12 ("The Commission considered the relevance of economic hardship and determined that personal financial difficulties and economic pressures upon a trade or business do not warrant a decrease in sentence."); see Koon v. United States, 518 U.S. 81, 93 (1996); United States v. Sachdev, 279 F.3d 25, 28 (1st Cir. 2002); United States v. Perez, 160 F.3d 87, 89 (1st Cir. 1998) (en banc); United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993). "Forbidden factors can never serve as the basis for a [guidelines] departure." United States v. Martin, 221 F.3d 52, 57 (1st Cir. 2000) (emphasis

-8-

added).[8]

## 2. __The Coconspirators' Assistance__

As the next basis for its "multiple causation" departure, the district court opined:

> [T]he fraud was also significantly perpetuated by the delivery [truck drivers] hired by the processing plant as they were entrusted with protecting the interests of the processing plant, trained to test for the quality of the milk product, and the authority to reject an unacceptable product, and responsibility for exposing farmers operating contrary to laws regulating consumer products. In a calculated and self-serving fashion, they recruited, encouraged farmers, or were themselves lured to engage in the adulteration of the milk to assist the farmers in meeting their quota for profit.

Assuming these district court statements contemplate that the loss calculations were inflated, in that the defendants did not commit the charged offenses alone but conspired with others to achieve their unlawful goal, the Sentencing Guidelines explicitly treat with any such factor. See 18 U.S.C. § 3553(b)(1). That is to say, the district court must attribute to the defendants the amounts of loss resulting from "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); see United States v. Marino, 277 F.3d 11, 37 (1st Cir.), cert. denied, 536 U.S. 948

---

[8]It is noteworthy that not even the defendants contend on appeal that economic hardship constituted a valid ground for the downward departure ordered by the district court.

(2002); <u>United States</u> v. <u>Adeniji</u>, 221 F.3d 1020, 1027 (7th Cir. 2000); <u>United States</u> v. <u>Duliga</u>, 204 F.3d 97, 100 (3d Cir. 2000).

It is patently clear that the defendants in the instant case fit this description, in that they concededly paid cash to the delivery truck drivers for aiding the concealment of their adulterations. The defendants incorrectly contend that the record demonstrates that the truckers sometimes acted independently of them. In arguing against a more-than-minimal-planning enhancement at the sentencing hearing, defense counsel merely observed that the truck drivers could have loaded adulterated milk at the defendants' farms without the need for the defendants' physical presence, since the truck drivers had ready access to the necessary equipment and supplies. Defense counsel's observation – which is unsupported by the record, <u>see</u> <u>United States</u> v. <u>Brassard</u>, 212 F.3d 54, 57 (1st Cir. 2000) (noting that counsel's remarks do not themselves constitute evidence), and which was raised merely to characterize the <u>modus</u> <u>operandi</u> of the defendants' conspiracy as rudimentary – does not preclude a reasonable inference that the defendants who were not physically present had prior knowledge of, or gave prior consent to, the unsupervised loadings conducted by their coconspirators.

The defendants further contend that the presentence report (PSR) states that other unidentified farmers, neither known to the defendants nor involved in their conspiracy, already had

-10-

delivered contaminated milk to the plants, and thus were exclusively responsible for at least a portion of the actual milk loss. Quite the contrary, the PSR states simply that the milk in the silos "may" have been contaminated by other farmers. The record contains no evidence, however, that any other farmer in fact delivered bad milk to the same silos or at the same times as the defendants' deliveries. See United States v. Sepulveda, 15 F.3d 1161, 1198-99 (1st Cir. 1993) (noting that sentencing findings must derive from some identifiable evidentiary basis in record). In any event, the defendants are not only responsible for the actual loss, but for the intended loss, see United States v. Gonzalez-Alvarez, 277 F.3d 73, 80-81 (1st Cir. 2002) (noting that defendant is responsible for intended loss if it exceeds actual loss), and it is beyond serious dispute that these defendants intended and foresaw that their adulterated milk would end up in the silos and contaminate the entire contents, resulting in a total loss of all those milk stocks. Accordingly, we conclude that the purported conduct of the truck drivers, whether or not defendants' coconspirators, cannot constitute a legitimate ground for a "multiple causation" departure.

### 3.   The Conduct of the Victim's Agents

The district court went on to identify the purported complicity of the milk plant employees in the defendants' milk-adulteration scheme as a further factor providing support for its

downward departure:

> [I]t was business as usual at the processing plant as it was well known who were the truckers engaged in the adulteration of milk. However, plant managers neglectfully turned the other way, consciously failed their duty and responsibility to expose the corrupt truckers to their superiors or authorities, and contributed to the lawful (sic) practice by assuring that the profitable routes involving farmers actively adulterating milk were assigned to the corrupt truckers. It would be incredulous (sic) that the managerial/supervisory staff at the processing plant was not aware or could not have been aware of the unlawful adulteration process, therefore, [it] significantly contributed to the total loss through aiding and abetting.

A victim's conduct may warrant a downward departure where the victim significantly contributed to an increase in the amount of loss. See, e.g., United States v. Rostoff, 53 F.3d 398, 407 n.8 (1st Cir. 1995). Assuming, arguendo, that the same rule might apply even though the defendants injured other victims who concededly did not contribute to the loss (viz., milk consumers), the evidentiary record in the instant case cannot meet such a standard. First, there is no record support for the district court's supposition that the plant managers knew or should have known of the adulteration perpetrated by the defendants, nor that the plant managers acted either negligently or improperly. See Sepulveda, 15 F.3d at 1198-99. But cf. Rostoff, 53 F.3d at 407 n.8 (noting that defrauded bank officials conducted themselves in "incredibly negligent fashion" by approving fraudulent loans "with

-12-

an abandon commonly associated with drunken sailors," and routinely violated official bank policies).

Moreover, these defendants "paid off" the truck drivers for the very purpose of obtaining their assistance in disguising their own adulteration of the milk upon its arrival at the plant. Consequently, there is simply no record evidence that the adulteration would have been patently obvious to any other employees at the plant. Cf. U.S.S.G. § 2F1.1, comment. (n.11) (providing that downward departure for inflated loss may be warranted where "no one would seriously consider honoring" the fraudulent instrument); United States v. LeRose, 219 F.3d 335, 338-39 (4th Cir. 2000) (noting lack of record evidence that bank's conduct affected amount of loss, or that negotiated instrument was "obviously fraudulent").

**4. Sentencing Manipulation**

As a fourth basis for its downward departure, the district court concluded that the government contributed to the amount of the loss:

> The [FDA] agent also played a role in the overall accumulation of loss as he decided when enough information had been gathered to initiate the prosecution of the defendant, contributed to the actual adulteration of the milk, and allowed the adulterated milk to reach the silos at the processing plant. The defendant was charged with eleven separate acts of adulteration spanning a period of approximately four years. As such, the number of times the defendant was allowed to engage in the adulteration process corresponds to the

number of times the delivery truck was also increasing the volume of adulterated milk.

Government manipulation designed solely to increase the severity of a criminal sentence may afford a ground for departure, provided there is sufficient record evidence to demonstrate that the government acted in "bad faith." See Gonzalez-Alvarez, 277 F.3d at 80-81 (noting that calculation of amount of intended loss was based on defendant's assumption that government would not discover his adulteration). "Given the wide latitude we afford the government in conducting sting operations, 'the burden of showing sentencing factor manipulation [necessarily] rests with the defendant. As with other fact-sensitive sentencing issues, the burden of proof must be carried by a preponderance of the evidence.'" United States v. Rizzo, 121 F.3d 794, 801 (1st Cir. 1997) (citation omitted). "[G]arden variety manipulation claims are largely a waste of time." United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995).

Since the record on appeal in the instant case fails to suggest so much as a hint of bad faith on the part of the government, the defendants have failed to sustain their burden of proof, and the "factfinding" engaged in by the district court must be set aside as plainly speculative and clearly erroneous. See United States v. Gibbens, 25 F.3d 28, 30 (1st Cir. 1994).

5.    **Absence of Injury to Public Health**

Finally, the district court opined that the record

contained no evidence that the milk supplied by the defendants adversely affected any consumer's health:

> [T]he commission of the offense did not result in any actual financial loss or health problems. The dairy industry has confirmed that any potential health hazard would have been neutralized and the below grade quality of the milk would have been enhanced through the treatment, processing, and commingling of the adulterated milk in the silos. As such, the product substitution caused by the addition of non-harmful agents, that is water and salt, would equate to the same guidelines imprisonment range, absent an upward departure, as that of a defendant who introduced harmful agents to the final milk product or defrauded the victim of an actual $900,000.

On these identical facts, however, this court had already held that (i) the same processor and the ultimate consumers of its milk were <u>all</u> <u>victims</u> of the crimes committed by these defendants; (ii) the ultimate consumers sustained actual financial loss, in that the consumers paid Grade A milk prices for milk which was adulterated and worthless as a matter of law; and (iii) the defendants' supposition that the consumers sustained no injury to their health by reason of the adulterated milk was insupportable. <u>Gonzalez-Alvarez</u>, 277 F.3d at 80.[9] The case at bar is factually

---

[9]Furthermore, the relevant PSRs disclosed that (i) the defendants used contaminated, unsanitary water to dilute their milk; and (ii) the FDA reported that these additions "could have caused the introduction of bacterial/viral organisms that are not eliminated properly by the pasteurization process and resulted in known and unknown health problems." The defendants counter that an official of ORIL, the Commonwealth's milk regulatory agency, stated that "the pasteurization process would have killed all harmful

-15-

indistinguishable from Gonzalez-Alvarez.

Although certain factors relied upon by the district court may be appropriate components of a "multiple causation" departure in particular circumstances, the instant decision related specifically to the evidence in this case. Thus, we simply hold that whether evaluated individually or collectively, the five factors identified by the district court in the instant case do not constitute appropriate grounds for a downward departure.[10]

## B. The Mental-Health Departure

The district court discerned an additional ground for its

---

bacteria as required by federal regulations." We agree with the government's contention that this statement does not contradict the FDA statement on the futility of pasteurization. The ORIL official, whose announced intention was merely to show that the defendants' milk was relatively uncontaminated, stated that pasteurization of defendants' milk would kill all bacteria in unadulterated milk that government-mandated pasteurization is expected to kill, whereas other bacteria or impurities might have remained in appellees' adulterated milk even after pasteurization, which in turn would have reached the consumer who purchased the non-Grade A milk. See 21 U.S.C. § 331(a) (prohibiting distribution of any non-Grade A milk in interstate commerce).

[10]We note that the district court, upon remand following our previous vacatur of these defendants' sentences, see supra notes 2 & 3, once again departed downward to the same Sentencing Guidelines ranges relied upon prior to our remand, and that both district judges employed virtually identical language in rationalizing their departures. Insofar as this course of action may connote the district court's subjective dissatisfaction with the Guidelines' sentencing constraints, it is manifestly unavailing. See United States v. Studley, 907 F.2d 254, 260 (1st Cir. 1990) ("Regardless of how well founded, a belief by the sentencing judge that the punishment set by the Commission is too severe or that the guidelines are too inflexible may not be judicial grounds for departure under the sentencing system mandated by Congress.") (emphasis added).

-16-

downward departure from the applicable guideline sentencing range with respect to Picon:

> Shortly after his initial arrest in connection with the instant case, defendant Picon developed mental health problems requiring professional attention to include pharmacology. His subsequent depressed financial situation forced him to sell his contract with the milk industry, cease operations as a dairy farmer, file for bankruptcy, and maintain odd jobs resulting in meager wages all of which contributed to exacerbating his mental health condition. Prolonged incarceration would worsen the defendant's mental health condition and result in greater costs to the United States. The Court understands that all defendants initially suffer from emotional problems at the time of their arrests or during the commencement of the prosecutorial process, but most are able to overcome the condition. However, in the case of Mr. Picon, that is the defendant, he has not been able to do so. Pursuant to his therapist, defendant's prognosis is guarded. I have examined the therapist's evaluation submitted to the court.

The government contends on appeal that the district court abused its discretion in relying upon Picon's mental-health condition as a ground for its downward departure, because it failed to make the requisite express finding that the Bureau of Prisons is unable to provide Picon with adequate treatment for his condition.

The Sentencing Guidelines provide:

> Mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure). Mental and emotional conditions may be relevant in determining the conditions

of probation or supervised release; e.g., participation in a mental health program (see §§ 5B1.3(d)(5) and 5D1.3(d)(5)).

U.S.S.G. § 5H1.3.[11] Nevertheless, departures based upon a defendant's mental condition are discouraged, see United States v. Aker, 181 F.3d 167, 173 (1st Cir. 1999); see also Rivera, 994 F.2d at 948, which means that the sentencing court must first make a finding that the mental condition is extraordinary or atypical, see Koon, 518 U.S. at 94-95; United States v. Rivera, 192 F.3d 81, 85 (2d Cir. 1999); United States v. Pullen, 89 F.3d 368, 371 (7th Cir. 1996).

The government's reliance upon United States v. Studley, 907 F.2d 254 (1st Cir. 1990), is misplaced. The narrow issue in Studley was whether the sentencing court should depart downward in the event that the Bureau of Prisons were not equipped to treat the defendant's mental condition. Id. at 259. Whenever the sentencing court intends to depart downward under U.S.S.G. § 5H1.3, however, it must first determine that the defendant's mental condition presents an "extraordinary" or "atypical" case. See United States v. Doering, 909 F.2d 392, 394-95 (9th Cir. 1990)

---

[11]Picon has never contended that his pre-existing depression played any role in the commission of the underlying offense. See U.S.S.G. § 5K2.13 (1997) ("If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.").

(holding that defendant's need for treatment, standing alone, is not an adequate ground for departure); see also United States v. Moses, 106 F.3d 1273, 1280 (6th Cir. 1997) (same). Although the unavailability of an adequate prison-treatment program could conceivably give rise to an "extraordinary" case, that is not a sine qua non for a U.S.S.G. § 5H1.3 departure. Thus, for example, a sentencing court might determine that a defendant's mental condition is such that a lengthy imprisonment would work irreparable harm, thereby rendering irrelevant the availability vel non of prison-treatment programs.

Turning to this threshold issue, and bearing in mind that departures under U.S.S.G. § 5H1.3 are discouraged, our own examination of the medical evaluation relating to Picon's mental condition clearly reveals that the district court erred in determining that Picon's mental condition is extraordinary. Dr. Cesar Padilla Maldonado, Picon's psychiatrist, opined that the indictment had caused Picon major or severe depression,[12] which resulted in business failures and family rifts.[13] Importantly, however, Dr. Maldonado acknowledged that once placed on anti-depressant and anti-anxiety medications, Picon had shown marked

_____

[12]In June 1999, the symptoms included sadness, generalized anxiety, poor motivation, indifference, memory loss, poor attention span, and psycho-motor retardation.

[13]Picon successfully engaged in a prolonged legal battle with his ex-wife to retain visitation rights with his seven-year-old daughter.

improvement.  See United States v. Peterson, 225 F.3d 1167, 1171 (10th Cir. 2000) (noting that defendant's treatment for depression and anxiety not "unusual"); see also U.S. Dep't of Health and Human Servs. Substance Abuse and Mental Health Servs. Admin., Nat'l Mental Health Info. Ctr., Bulletin Vol. 3, No.2 (2003), available at http://www.mentalhealth.samhsa.gov/default.asp (reporting that depression affects almost one in ten American adults); Nat'l Inst. of Health, Depression Research Fact Sheet (Apr. 2, 2002), available at http://www.nimh.nih.gov/publicat/depresfact.cfm ("Depressive disorders affect approximately 19 million American adults.").

Moreover, Picon consistently has denied suicidal ideation.  Cf. United States v. Harpst, 949 F.2d 860, 863 (6th 1991) (rejecting downward "mental health" departures based on defendant's suicidal tendencies).  Nor has he ever been diagnosed with any extreme form of mental disease, such as psychosis or schizophrenia.  Cf. United States v. Barton, 76 F.3d 499, 502 (2d Cir. 1996) (vacating § 5H1.3 departure absent evidence defendant suffered from psychosis, where defendant's sense of morality remained intact, and "[h]e appreciate[d] both the societal and moral constraints of his behavior"); United States v. Lauzon, 938 F.2d 326, 333 (1st Cir. 1991) (noting that defendant's "borderline intelligence" was not ground for § 5H1.3 departure).  Although Dr. Maldonado opined that a three-year term of imprisonment would be a "catastrophic blow" to Picon, nothing in the record on appeal

suggests that Picon's depression, however unfortunate, rises to the level of the "extraordinary." Undoubtedly, imprisonment is stressful. With or without a § 5H1.3 departure, however, Picon will be required to serve some prison time, yet will continue to receive the same effective treatment in prison.[14] As Picon's commission of the criminal offense constituted the catastrophic event which precipitated his conviction and imprisonment, the adverse consequences flowed from his voluntary criminal conduct and ensuing guilty plea. See United States v. Walker, 27 F.3d 417, 418-19 (9th Cir. 1994) (holding that defendant's arrest-induced depression, anxiety and sleeplessness were "irrelevant for sentencing purposes," given that "[p]ost-arrest emotional trauma is a natural consequence of being charged with a crime"). Accordingly, the record in the present case discloses no material basis — evidentiary or legal — for concluding that the Sentencing Guidelines permitted a § 5H1.3 departure, or for that matter, any other type of guideline departure.

**The sentences imposed by the district court are hereby reversed; the cases are remanded for further proceedings consistent with this opinion. Upon remand, the cases shall be assigned to a**

---

[14]The district court's statement that Picon's "[p]rolonged incarceration would . . . result in greater costs to the United States" is also an inappropriate basis for its departure decision. See United States v. Maldonado, 242 F.3d 1, 4-5 (1st Cir. 2001) (noting that costs of incarceration normally are not grounds for downward departure); United States v. Wong, 127 F.3d 725, 728 (8th Cir. 1997) (same).

-21-

**different judge for sentencing in accordance herewith**.  SO ORDERED.